# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 7, 2015

## STATE OF TENNESSEE v. BRANDON LEON FORBES

**Appeal from the Circuit Court for Madison County**
**No. 14-234     Roy B. Morgan, Jr., Judge**

---

**No. W2014-02073-CCA-R3-CD  -  Filed October 5, 2015**

---

Following a jury trial, the Defendant, Brandon Leon Forbes, was convicted of aggravated burglary, a Class C felony; theft of property valued at $10,000 or more but less than $60,000, a Class C felony; and vandalism of property valued at $500 or less, a Class A misdemeanor.  See Tenn. Code Ann. §§ 39-14-103, -105, -403, -408.  The trial court sentenced the Defendant as a Range III, persistent offender to a total effective sentence of twenty-four years.  In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; (2) that the State committed prosecutorial misconduct during voir dire; (3) that juror misconduct occurred during the course of his trial; (4) that the trial court erred in determining the length of his sentences; and (5) that the trial court erred in imposing partial consecutive sentences.[1]  Following our review, we affirm the judgments of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Brandon Leon Forbes.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] For the purpose of clarity, we have reordered and renumbered the Defendant's issues from how they appeared in his brief.

## FACTUAL BACKGROUND

Lucy Munoz[2] testified that on February 15, 2013, she and her three-year-old son were living with her parents and younger brother at their home in Jackson. Lucy recalled that she had gone home in the early afternoon for her lunch break that day. When she pulled into the driveway, Lucy noticed that no one appeared to be home but that the garage door "was probably one-fourth open." Lucy opened the garage door and noticed that the garage was empty but that the interior door from the garage to the house was open. Lucy testified that this was very unusual.

Lucy entered the house and walked toward her room. Lucy noticed that "all the lights" were on. Lucy testified that nothing else "looked abnormal" to her until she got to her parents' bedroom and saw that it had been ransacked. Lucy recalled that a large dresser "had been pulled out off the wall into the middle of the room and [its] drawers were all open." The television that had been mounted above the dresser was gone. Lucy then noticed that "all the other drawers of everything they had [were] opened" and so was the door to their bedroom closet.

Lucy testified that at that point, she realized the house had been burgled. She then "froze" in her parents' bedroom and called her father. Her father told her to call the police. Lucy testified that she then left the house and called the police from a neighbor's house. Lucy returned and walked through the house with the police when they arrived. Lucy recalled that her bedroom "was messy." The window in her bedroom facing the backyard had been broken out. Lucy noticed that all of her "drawers were open" and that her television, DVD player, and laptop were gone.

Lucy recalled that her son's room appeared to be "completely untouched" with maybe a drawer open. Lucy testified that her younger brother lived upstairs and that in his room, a television had been taken, along with his computer, paintball equipment, video gaming console, and several video games. Lucy also testified that the gate to their backyard, which they normally kept shut, was open and that the backdoor of the house appeared to have been damaged.

On cross-examination, Lucy testified that the day before the burglary, there was a child support hearing between her and her son's father, Blake Andrews. Lucy denied that Mr. Andrews knew about her parents' safe and other valuables in the house. Lucy testified that Mr. Andrews was Caucasian with brown hair and blue eyes. Lucy also testified that Mr. Andrews died in a car accident prior to trial. Lucy admitted that she did not know the Defendant.

---

[2] Several members of the Munoz family testified at trial. As they all share the same surname, we will refer to them in this opinion by their given names. This is solely for clarity, and no disrespect is intended.

Carol Munoz testified that on February 15, 2013, she received a phone call from her husband asking her to go to their house because it had been broken into. Carol testified that, at the time of the burglary, she and her husband owned a restaurant and she prepared "taxes for the Hispanic community." Carol explained that most of her customers paid in cash for her tax preparation services. Carol further explained that there was a significant amount of cash in her home at the time of the burglary because it was the middle of "tax season."

Carol testified that a "safety box" had been taken from her bedroom closet. Carol estimated that the "safety box" contained between $10,000 and $15,000 cash when it was taken from the house. Carol testified that the "safety box" also contained four rings, "a gold watch," a ruby bracelet, a gold bracelet, and several uncirculated coins. In total, Carol estimated that the items taken from her home, in addition to the cash, valued approximately $9,000. Carol testified that she was most upset about the gold bracelet that had been taken because it had been given to her by her grandmother and was "pure gold."

Thomas C. Wilson testified that he was the victims' neighbor and that on February 15, 2013, he went to their house after he saw that the police were there. Mr. Wilson was told about the burglary, and he told the police that he had seen a white car speeding through the neighborhood earlier that day. Mr. Wilson testified that the car stopped in front of the Munoz home, and he saw an African American man get out and walk to the front door.

Mr. Wilson testified that the man who got out of the car appeared to be less than six feet tall and weighed approximately 150 to 160 pounds. Mr. Wilson admitted that he was too far away to identify the man's face and that he did not see the man again after he walked to the front door. Mr. Wilson testified that the driver of the white car was a "[h]eavy set" African American man.

Mr. Wilson recalled that after dropping off the smaller man, the white car drove away. "A short time after that," the white car "circled through" the neighborhood and left again. Mr. Wilson testified that the white car then "came back and turned into the [Munoz's] driveway." Mr. Wilson admitted that after the car turned into the driveway he "couldn't see it" and did not see it again that day.

The police were unable to find any fingerprints at the Munoz home. However, on February 25, 2013, Investigator Dewayne McClain of the Jackson Police Department (JPD) and several other officers executed a search warrant at a home owned by the Defendant's mother, Patricia Sain. Inv. McClain testified that there was no one at the house when they arrived. Ms. Sain's daughter arrived soon after the police did and let them in the house. Shortly after that, Ms. Sain arrived at the house.

Inv. McClain recalled seeing Ms. Sain make a phone call during the search of the house. Inv. McClain testified that "at some point," Ms. Sain handed the phone to him and said that he needed to talk to the Defendant. Inv. McClain further testified that he was familiar with the Defendant's voice and that he recognized the voice he heard on the phone as being the Defendant's.

According to Inv. McClain, the Defendant said, "[M]y mama ain't got nothing to do with this." Inv. McClain claimed that the Defendant then said that he knew what the police were looking for and that he could tell them where it was himself. Inv. McClain testified that the Defendant told him that "the coins and stuff" were in the attic hidden under some insulation beneath "the air conditioning unit at the top of the stairs." However, Inv. McClain testified that the Defendant never admitted to committing the burglary.

Inv. McClain sent another officer, Investigator Kenneth Jones, to the attic to check under the air conditioning unit. Inv. Jones found a blue bag where the Defendant said the items would be located. Inside the bag were a gold bracelet, several nickels, an uncirculated silver dollar, and several uncirculated one-dollar coins. Carol identified the gold bracelet as the one given to her by her grandmother and testified that the coins had all been in the "safety box." These were the only items the police recovered from the burglary.

Inv. McClain testified that the Defendant used his mother's house as his address. Ms. Sain testified that on Feburary 25, 2013, her daughter lived at the house and that her daughter's boyfriend and the Defendant "sometimes" did also. Ms. Sain claimed that her daughter called someone and that she simply handed the phone to Inv. McClain without speaking to the person on the other end of the line or asking who it was. Ms. Sain admitted that after speaking with the person on the phone, the police searched the attic and recovered the stolen items, which she "signed for."

Ms. Sain testified that the Defendant had stayed at her house during the first or second week of February 2013. Ms. Sain also testified that on February 25, 2013, she did not know where the Defendant was but that he was supposed to be in Detroit, Michigan. Ms. Sain further testified the Defendant did eventually go to Detroit but that she was not sure exactly when that was. Ms. Sain claimed that she did not know who put the stolen items in her attic.

Ms. Sain was confronted at trial with a recording of a phone call between her and the Defendant. In the phone call, Ms. Sain said that, "the s--t was in [her] house" and told the Defendant that, on the day the search warrant was executed, she gave the phone to Inv. McClain and said it was the Defendant on the phone.

JPD Investigator Kevin Mooney was called by the Defendant to testify at trial. Inv. Mooney testified that he was the responding investigator to the Munoz home on February 15, 2013. Inv. Mooney recalled that the patrol officers who responded to the house had compiled a list of stolen items. Inv. Mooney admitted that the gold bracelet found at Ms. Sain's house was not on the list. Carol testified that she could not remember if she told the responding officers about the bracelet immediately after the burglary. Inv. Mooney testified that it usually takes some time for people to realize what had been taken after a burglary. Inv. Mooney also testified that, to his knowledge, no one ever spoke to Mr. Andrews about the burglary.

The Defendant also called Mario Munoz to testify at trial. Mario testified that on the day of the burglary he told the police that Mr. Andrews "could have possibly" been the perpetrator. Mario explained that he said this because the day before the burglary, Mr. Andrews and his daughter had been in court "for child support or something" and that Mr. Andrews had "seemed upset" about the outcome of the hearing. However, Mario testified that Mr. Andrews had never stayed in his house and was "[n]ot really" familiar with it. Mario admitted that he did not know the Defendant.

The Defendant testified in his own defense at trial. The Defendant denied burglarizing the Munoz home or even knowing where it was. The Defendant also denied knowing who committed the burglary or how the stolen items got into his mother's attic. The Defendant claimed that on February 25, 2013, he was in Detroit and denied ever speaking to his sister, his mother, or Inv. McClain that day. The Defendant insisted that his mother was lying about him being on the phone and speaking to Inv. McClain during the search of her house.

The Defendant continued to deny speaking to anyone on the phone on February 25, 2013, even after being confronted with the recorded phone conversation between him and Ms. Sain. The Defendant admitted that in the recorded phone call he argued with his mother because she had told the police it was him on the phone on February 25, 2013. Also during the recorded phone call, Ms. Sain said that her daughter's boyfriend was "the one that told [the police] about the f--king place [the Defendant] went."

The Defendant admitted that he had listed his mother's house as his address on February 1, 2013. The Defendant also admitted that he was five feet, eleven inches tall and weighed approximately 150 pounds.

Based upon the foregoing evidence, the jury convicted the Defendant of aggravated burglary, theft of property valued at $10,000 or more but less than $60,000, and misdemeanor vandalism for the damage to Lucy's window.

At a subsequent sentencing hearing, it was revealed that the Defendant had thirteen prior felony convictions. The Defendant had ten prior convictions for felony theft, as well as convictions for aggravated burglary, escape, and felony evading arrest. Additionally, the Defendant had been adjudicated delinquent as a juvenile for attempted burglary. The Defendant also had misdemeanor convictions for theft, domestic assault, driving on a revoked license, and failure to stop at the scene of an accident. The Defendant had a probationary sentence revoked on one prior occasion and was released on parole at the time the offenses at issue were committed.

Based upon the Defendant's prior convictions, the trial court sentenced him as a Range III, persistent offender. The trial court found that the following enhancement factors applied: (1) the Defendant had a history of criminal convictions in addition to those necessary to establish the appropriate range; (3) the offense involved more than one victim; (8) prior to sentencing, the Defendant had failed to comply with the conditions of a sentence involving release into the community; (13) at the time of the offenses the Defendant was released on parole; and (16) the Defendant had been adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. See Tenn. Code Ann. § 40-35-114.

In mitigation, the trial court found that the Defendant's conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). However, the trial court refused the Defendant's request to find that he assisted the authorities in recovering property involved in the crime. See Tenn. Code Ann. § 40-35-113(10). The trial court did so because the Defendant denied assisting Inv. McClain during his testimony at trial and "made it very clear . . . [he thought] his mother was a liar."

Based upon the foregoing enhancement and mitigating factors, the trial court sentenced the Defendant to below mid-range sentences of twelve years for the aggravated burglary and theft of property convictions. The trial court also sentenced the Defendant to eleven months and twenty-nine days for the misdemeanor vandalism conviction.

The trial court then found, with respect to consecutive sentencing, that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood and that he was an offender whose record of criminal activity was extensive. See Tenn. Code Ann. § 40-35-115(b)(1)-(2). The trial court ordered that the Defendant's sentences for aggravated burglary and theft of property run consecutively and that his sentence for misdemeanor vandalism run concurrently to his felony convictions, for a total effective sentence of twenty-four years. This timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant limits his argument regarding the sufficiency of the convicting evidence to the issue of identity. The Defendant argues that the State failed to prove his identity as the perpetrator because Mr. Wilson failed to identify him, there was no physical evidence "from the scene linking [him] to the crimes," the majority of the stolen items were never recovered, and the police failed to "scrutinize" other possible suspects. The State responds that the evidence was sufficient to establish the Defendant's identity as the perpetrator of the offenses.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the

defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). Here there was significant circumstantial evidence establishing the Defendant's identity as the perpetrator.

The Defendant physically matched Mr. Wilson's description of the man he saw leave the white car and walk to the front door of the Munoz home. Several items taken from the Munoz home, including the gold bracelet given to Carol by her grandmother, were found in the Defendant's mother's attic ten days after the burglary. The Defendant had used his mother's house as his address, and Ms. Sain testified that he was staying there the first or second week of February. Importantly, Inv. McClain testified that he spoke to the Defendant on the day of the search, that the Defendant said that Ms. Sain had "nothing to do with this," and that the Defendant then told him exactly where the items were hidden in the attic. Accordingly, we conclude that the evidence sufficiently established the Defendant's identity as the perpetrator of the offenses.

## II. Prosecutorial Misconduct

The Defendant contends that the State committed prosecutorial misconduct during voir dire. The Defendant argues that the prosecutor revealed to the jury pool during voir dire that "he had personally been the victim of prior burglaries." The Defendant further argues that "the comments made by the [prosecutor] during voir dire were so prejudicial that he should receive a new trial." The State responds that the Defendant has waived full appellate review of this issue by failing to make a contemporaneous objection and that plain error review is not warranted.

During voir dire, the following exchange between the prosecutor and a potential juror occurred:

[Prosecutor]: [Prospective juror], let me make sure. You've been the victim of a burglary, correct?
[Prospective juror]: Yes, sir.
[Prosecutor]: You know, since I've been assistant D.A. my house has been burglarized twice and as I understand it somebody was charged in your case. Good for you. They couldn't find the ones that did mine.
But just as - - when I come to work I have to sit that personal experience aside. When you come in here to work as a juror, as the Judge has told you, you've got to sit that personal experience aside. And you're telling us you can do that?
[Prospective juror]: Yes
[Prosecutor]: Now, how did that make you feel when you came home and saw that your house had been burglarized?
[Prospective juror]: Terrible feeling.
[Prosecutor]: What?
[Prospective juror]: Terrible feeling.
[Prosecutor]: Terrible. The reason why I ask that because I can understand. Did it generate a strong emotion with you?
[Prospective juror]: Yes.
[Prosecutor]: Okay. And you can [set] that aside?
[Prospective juror]: Yes.

The Defendant did not object to the prosecutor's comments, and the prospective juror was ultimately excused. In denying a new trial with respect to this issue, the trial court warned the prosecutor not to make such statements during voir dire again.

Because the Defendant did not contemporaneously object to the prosecutor's comments, he has waived full appellate review of this issue. See Tenn. R. App. P. 36(a) (stating that full appellate review is not available when a defendant fails "to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); State v. Armstrong, 256 S.W.3d 243, 249 (Tenn. Crim. App. 2008) (stating that "typically when a prosecutor's statement was not the subject of a contemporaneous objection, the issue is waived"). As such, we review this issue only to determine whether plain error review is warranted.

Plain error is warranted only when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, plain error review is not warranted because the Defendant has failed to show that a substantial right was adversely affected. Page, 184 S.W.3d at 230. For a substantial right of the accused to have been adversely affected, "the error must have prejudiced" the defendant. Armstrong, 256 S.W.3d at 250. Put another way, the error "must have affected the outcome of the trial or court proceedings." Id. In light of the substantial circumstantial evidence of the Defendant's guilt, we cannot conclude that the prosecutor's comments during voir dire prejudiced the Defendant and affected the outcome of the trial. Accordingly, we conclude that plain error review of this issue is not warranted.

### III. Juror Misconduct

The Defendant contends that juror misconduct occurred during the course of his trial. The Defendant's argument is limited to two conclusory sentences that "juror misconduct arose" when a juror "exhibited some interest in the prosecutor that likely influenced his ability in serving as a fair and impartial juror." The State responds that the Defendant has waived this issue by failing to "pursue the issue when offered the opportunity by the trial court" and that plain error review of this issue is not warranted.

After a break in the trial proceedings, the following exchange occurred:

[Prosecutor]: Judge, I told [defense counsel] this. As I was coming up the steps a juror asked me how I remembered everybody's name and I told him I could not speak with him and kept on walking. But I just wanted to put that on the record that I disclosed that to [defense counsel].
[Trial court]: Good. Any comments, [defense counsel]?
[Defense counsel]: No, Your Honor. There has been occasion in the past one might say, "Hi, how are you doing."
[Trial court]: Are we ready to proceed?

The Defendant has waived full appellate review of this issue by failing to request any curative measures or a further hearing into the extra-judicial contact between the prosecutor and the juror. See Tenn. R. App. P. 36(a) (stating that full appellate review is not available when a defendant fails "to take whatever action was reasonably available to

-10-

prevent or nullify the harmful effect of an error"). As such, we review this issue only to determine whether plain error review is warranted.

Plain error review is not warranted here because the Defendant has failed to show that a clear and unequivocal rule of law was breached. Page, 184 S.W.3d at 230. As our supreme court has noted, "[n]ot every extra-judicial communication between a juror and a third-party requires the [trial] court to disqualify the juror, declare a mistrial, or grant a new trial." State v. Smith, 418 S.W.3d 38, 49 (Tenn. 2013). Instead, those remedies "are required only when the extra-judicial communication is prejudicial to the defendant and is not harmless error." Id. "This is true even when the non-juror is a party, a witness, or someone otherwise interested in the case." Id. As the exchange between the prosecutor and the juror appeared to be merely an idle comment, no clear and unequivocal rule of law was breached. Accordingly, we conclude that plain error review of this issue is not appropriate.

*IV. Sentencing Issues*

*A. Length of Sentences*

The Defendant contends that the trial court erred in determining the length of his sentences. The Defendant argues that the trial court should have considered in mitigation the fact that he assisted the authorities in recovering some of the stolen property and that application of that mitigating factor would "have caused the trial court to impose" sentences of less than twelve years. The State responds that the trial court did not abuse its discretion in imposing sentences below the mid-range for the Defendant's aggravated burglary and theft of property convictions.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to

implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

Here, the trial court imposed sentences well within the appropriate statutory range of punishment. The trial court examined in detail both the State's proposed enhancement factors and the Defendant's proposed mitigating factors. The trial court found several enhancement factors applied, chief among them that the Defendant had an extensive history of criminal convictions, including ten prior convictions for felony theft. The trial court found that only one mitigating factor applied.

The trial court rejected the Defendant's proposed mitigating factor that the Defendant assisted in the recovery of some of the stolen items because the Defendant emphatically denied doing so during his trial testimony. As noted above, even if the trial court's decision with respect to this mitigating factor was erroneous it would not warrant reversal of the sentencing decision when "there are other reasons consistent with the purposes and principles of sentencing" to support the sentencing decision. Bise, 380 S.W.3d at 706. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to twelve years for his aggravated burglary and theft of property convictions.

### B. Consecutive Sentencing

The Defendant contends that the trial court erred by imposing partial consecutive sentences. The Defendant argues that the trial court "failed to make specific factual findings to support" that he was a professional criminal who knowingly devoted his life to criminal acts as a major source of livelihood. The State responds that the trial court

did not abuse its discretion in imposing partial consecutive sentences because the Defendant was an offender whose record of criminal activity was extensive.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was a professional criminal who had knowingly devoted his life to criminal acts as a major source of livelihood and that he was an offender whose record of criminal activity was extensive. See Tenn. Code Ann. § 40-35-115(b)(1)-(2). The trial court was justified in imposing partial consecutive sentences given the Defendant's extensive history of criminal activity that included thirteen prior felony convictions, including ten for felony theft, four misdemeanor convictions, a juvenile adjudication for attempted burglary, and a prior probation revocation. Because only one of the grounds listed in section 40-35-115(b) is needed to justify consecutive sentencing, we need not determine whether the trial court properly concluded that the Defendant was a professional criminal. Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-13-